**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CALVIN F. PINSON,**

       **Plaintiff,**

**v.**                              **Case No.: 3:14-cv-31165**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 5, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**    **<u>Procedural History</u>**

Plaintiff, Calvin F. Pinson ("Claimant"), completed applications for DIB and SSI on March 8, 2012 and March 14, 2012, respectively, alleging a disability onset date of

October 31, 2007, (Tr. at 230, 232), which he later amended at his hearing to February 5, 2010,[1] (Tr. at 34), due to "back, leg pain, depression, anxiety, headaches, obesity, [and] knee pain." (Tr. at 251). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 10). Claimant filed a request for a hearing, which was held on July 15, 2013 before the Honorable Michele M. Kelley, Administrative Law Judge ("ALJ"). (Tr. at 27-75). By written decision dated August 28, 2013, the ALJ determined that Claimant was not disabled. (Tr. at 10-21). The ALJ's decision became the final decision of the Commissioner on October 29, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On December 30, 2014, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Proceedings on March 13, 2015. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is fully briefed and ready for disposition.

## II.   Claimant's Background

Claimant was 34 years old at the time of his alleged onset of disability and 37 years old at the time of the ALJ's decision. (Tr. at 34, 75). He completed the tenth grade in school, subsequently obtaining a GED, and he communicates in English. (Tr. at 34, 250). Claimant's prior work experience includes jobs as a delivery driver, telemarketer, and stocker. (Tr. at 34, 252).

---

[1] Claimant previously filed applications for SSI and DIB, which were denied by the February 4, 2000 written decision of an ALJ. The ALJ's decision became the final decision of the Commissioner when the Appeals Council refused a request for review. The Commissioner's decision was affirmed by this Court on October 26, 2011. Consequently, Claimant amended his onset date to one day after the ALJ's decision. (Tr. at 10, 34).

### III.  Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the

claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through September 30, 2010. (Tr. at 13, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since October 31, 2007, the alleged disability onset date.[2] (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "morbid obesity, diabetes mellitus, knee dysfunction, low back pain and hypertension." (Tr. at 13-15, Finding No. 3). Claimant also had several non-severe impairments, including hiatal hernia, depression, and anxiety. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal the severity of one of the listed impairments. (Tr. at 15, Finding No. 4). Therefore, the ALJ determined that Claimant had the RFC to:

> [P]erform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) as follows: he can lift, carry, push, and pull 10 pounds maximum; sit for six hours out of an eight-hour workday; stand and walk for six hours out of an eight-hour workday; occasionally climb ramps or stairs, balance, stoop, or crawl. The claimant can never kneel, climb ladders, climb ropes or

---

[2] This date should be February 5, 2010, the amended disability onset date.

scaffolds, and cannot crouch and squat due to knee pain. The claimant cannot work in concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dust, gas, and poor ventilation; and must avoid even moderate exposure to hazards, such as work at unprotected heights, around inherently dangerous moving machinery, or uneven surfaces, and around large bodies of water.

(Tr. at 15-19, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was capable of performing past relevant work as a telemarketer. The ALJ found that this occupation did not require the performance of work-related activities precluded by Claimant's RFC.  (Tr. at 19-20, Finding No. 6). The ALJ also found that in addition to his past relevant work, Claimant was capable of performing other jobs existing in significant numbers in the national economy. (Tr. at 19, Finding No. 6). The ALJ considered that (1) Claimant was born in 1976 and was defined as a younger individual on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material, because the Medical-Vocational Rules supported a finding of non-disability regardless of Claimant's transferable job skills. (Tr. at 19-20, Finding No. 6). Taking into account all of these factors and Claimant's RFC, and relying upon the opinion testimony of a vocational expert, the ALJ determined that Claimant could perform the following jobs at the sedentary level: telephone order clerk, clerical worker, and product grader, sorter, or selector. (Tr. at 20). Therefore, the ALJ concluded that Claimant was not disabled under the Social Security Act. (Tr. at 20, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence, because the ALJ failed to give proper weight to the opinion of Claimant's treating physician, Dr. Gregory Holmes, who stated that Claimant was unable to

consistently work eight hours a day, five days a week due to his morbid obesity, chronic back pain, and social anxiety. (ECF No. 11 at 4-7). Claimant asserts that Dr. Holmes's opinion was substantiated by the statements of a non-examining physician, Dr. Stephen Nutter, who diagnosed Claimant with chronic lumbar strain and degenerative arthritis, and by the diagnosis of major depressive disorder, recurrent, severe without psychosis, made by consultant, Susan Bartram, M.A. (*Id.* at 5). In view of the supporting diagnoses, Claimant contends that the ALJ disregarded applicable regulations favoring the opinions of treating physicians, and then exacerbated her error by failing to provide good reasons for the lack of weight she afforded Dr. Holmes's statement. Claimant maintains that if the ALJ was unsure about the basis of Dr. Holmes's opinion, she should, at a minimum, have sought clarification or supplementation from Dr. Holmes. (*Id.* at *7).*

The Commissioner responds by pointing out that the ALJ, not the treating physician, determines the Claimant's ability to work. The ALJ was not required to give any "special significance" to Dr. Holmes's opinion, but was required only to consider the opinion and weigh it based upon the record as a whole. (*Id.* at 9-12). The Commissioner emphasizes that the opinions of the consulting experts are not as supportive of Dr. Holmes's statement as Claimant argues in his brief. Indeed, while Dr. Holmes diagnosed Claimant with social anxiety, Ms. Bartram opined that Claimant's social function was within normal limits and his mental status was "generally normal." (*Id.* at 11). The Commissioner also notes that Dr. Nutter examined Claimant and found that he had limitations related to obesity, chronic lumbar strain, and degenerative arthritis; however, Dr. Nutter did not provide an opinion that these impairments prevented substantial, gainful activity. Dr. Uma Reddy, who reviewed Dr. Nutter's findings to assess Claimant's RFC, concluded to the contrary that Claimant could perform light work with additional

7

postural and environmental limitations. According to the Commissioner, the ALJ properly afforded great weight to Dr. Reddy's conclusions and committed no error in her assessment of Dr. Holmes's opinion.

## V.   Relevant Medical Records

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

On March 26, 2012, Claimant presented to Gregory A. Holmes, M.D., complaining of chronic knee pain and expressing a desire to lose weight. (Tr. at 338). At the time, Claimant was measured at slightly over six feet tall and weighed nearly 430 pounds. (Tr. at 335). Claimant reported that he took ibuprofen two to three times a day for pain, because Flexeril no longer provided much benefit. (Tr. at 338). Dr. Holmes examined Claimant, noting that he was in no acute distress. Claimant's knees showed no effusion, but Claimant had joint line tenderness bilaterally. Dr. Holmes assessed Claimant with morbid obesity. He discussed diet and exercise with Claimant and ordered physical therapy in order for Claimant to become more active and to alleviate knee pain. Dr. Holmes also decided to send Claimant to a nutritionist for diet advice. He instructed Claimant to return in one month. (*Id.*),

Claimant reported to Tri-State Rehab Services of Westmoreland on April 10, 2012 per Dr. Holmes's referral, and was seen by Craig Buell, MSPT. (Tr. at 325-26). Claimant provided a past medical history of arthritis, respiratory issues, and psychological problems. He complained of chronic bilateral knee pain, which he rated as five on a ten-point pain scale, when at rest, and as a nine with activity. He stated that his right knee

was more painful, but the left knee seemed weaker. Claimant reported that his knee pain had caused him to become less active, which in turn, had resulted in a sixty-pound weight gain. Claimant also complained of low back pain and a hernia. (Tr. at 325). Mr. Buell performed an objective inspection, finding Claimant to be morbidly obese. Claimant's range of motion in the right knee measured ten degrees to one hundred thirteen degrees while his left knee measured five degrees to one hundred twenty degrees. The strength of his quadriceps muscles was measured at 4-/5 on the right and 4+/5 on the left. His right hamstring was 4/5, and the left hamstring was 5/5. Claimant's gait was antalgic, with an external rotation of the right lower extremity. Mr. Buell performed some therapeutic exercises and instructed Claimant on a home exercise program. Mr. Buell documented that Claimant's problems included pain, decreased range of motion and strength, and gait abnormalities, but he still had fair rehabilitation potential. Mr. Buell recommended physical therapy two to three times per week for six weeks. (Tr. at 325-26).

Claimant attended physical therapy six additional times in April, 2012. (319-24). On April 11, Claimant reported problems going up and down stairs and getting out of a chair. He rated his current knee pain as two on a ten-point pain scale, with a 24-hour average of five and the worst at six. (Tr. at 324). Claimant underwent range of motion and stretching exercises of his knees. At the end of the sessions, he reported no pain and could walk up and down the stairs. On April 13, Claimant rated his current pain level at seven, adding that he was now having low back pain. (Tr. at 323). Although Claimant reported improvement in overall knee pain, he continued to have difficulty walking and going from a sitting to standing position. On April 18, Claimant rated the pain in his left knee at three and in his right knee pain at five. (Tr. at 322). He reported overall improvement of knee pain, but continued to have trouble with climbing stairs and getting in and out of a car.

On April 20, his pain level was rated at two, and he continued to report overall improvement. (Tr. at 321). Nonetheless, Claimant still experienced difficulty going up and down stairs and making positional transfers. On April 24, Claimant's pain level was a three in both knees, and he reported greater strength leading to an improved ability to walk on level surfaces. Claimant continued to have problems with stairs, however. (Tr. at 320). On April 26, Claimant reported that he had no pain in his knees and both his gait and ability to transfer from a sitting to standing position were better. (Tr. at 319). The physical therapist confirmed that Claimant showed functional improvement in climbing up stairs, but still had trouble walking down them.

On April 30, 2012, Claimant returned to Dr. Holmes, reporting that he was doing "okay," although he felt his anxiety was returning. (Tr. at 337). He requested a prescription for Wellbutrin. Claimant also complained of pain in his right anterior shoulder. He described feeling the shoulder "catching" in certain positions, which occasionally interfered with his sleep. Claimant stated that physical therapy was helping his knee pain, although he believed the benefits could be better as "they [were] not working on his knees at all." (*Id*.). On physical examination, Claimant appeared to be in no acute distress. His right shoulder revealed tenderness at the AC joint; however, there was no other tenderness anteriorly or laterally. Claimant demonstrated a full range of active and passive motion. Dr. Holmes assessed Claimant with anxiety and right shoulder pain. He prescribed Wellbutrin for anxiety and ordered x-ray of Claimant's AC joint.

Claimant presented for physical therapy three additional times in May, 2012. (Tr. at 316-18). On May 4, Claimant rated his pain at two, noting improvement with getting out of a chair or car, and with walking. (Tr. at 318). The therapist observed functional improvement in Claimant's increased activity tolerance, but documented that he still had

trouble descending stairs. On May 8, Claimant reported that his pain averaged between two and three on the pain scale, and he verified an overall reduction of pain. Claimant's function was improved, as evidenced by his range of motion and decreased pain. He continued to have trouble rising from a chair. (Tr. at 317). On May 10, Claimant was not currently experiencing any pain and rated his average pain level at two. (Tr. at 316). Functional improvement was noted in his gait on level surfaces and climbing up stairs; however, he continued to have problems descending stairs.

Claimant returned to Dr. Holmes on May 21, 2012 with a complaint of acute back pain. (Tr. at 336).  Claimant reported that he completed a functional capacity evaluation at physical therapy without issue; however, he was now having significant right-sided low back pain that radiated into the left side. Claimant told Dr. Holmes that neither tizanidien, nor ibuprofen, was effective at relieving his discomfort. On physical examination, Claimant was in no acute distress, with stable vital signs, although he appeared in "significant" pain. Dr. Holmes documented that Claimant had much difficulty rising from a seated position to a standing position. Dr. Holmes assessed Claimant with mechanical low back pain and prescribed Valium 5 mg to be taken twice daily.

Claimant returned nine days later and reported that his back had improved and he was moving around more. (Tr. at 367). Claimant indicated that Valium was helpful. Claimant was upset that he was denied disability but stated that "physically he [was] doing okay." (*Id.*). On physical examination, Claimant appeared in no acute distress with stable vital signs, although Dr. Holmes reported Claimant's blood pressure, which had been high the last several visits, continued to be "up." Dr. Holmes observed that Claimant had good eye contact and normal range of affect. He assessed Claimant with hypertension, morbid obesity, and depression. Claimant was advised to continue taking Wellbutrin every day.

Hydrochlorothiazide 25 mg daily was prescribed to control Claimant's blood pressure.

Claimant returned to Dr. Holmes's office on September 4, 2012 for follow-up. (Tr. at 368-70). Claimant told Dr. Holmes that he currently had no medical complaints. He admitted that he had not taken his medications for the past month, but stated that he was not depressed, "just lazy and didn't go to the pharmacy." (Tr. at 368). On further questioning by Dr. Holmes, Claimant reported having moderate depression, accompanied by increased appetite, increased sleep, and anhedonia. Claimant admitted to smoking a pack of cigarettes per day, but denied alcohol or illegal drug use. On physical examination, Claimant was 6 feet 3.5 inches tall and weighed 410 pounds. (Tr. at 370). He appeared well, alert, and oriented with normal grooming, normal affect, and euthymic mood. Dr. Holmes diagnosed Claimant with benign hypertension and depression. He prescribed Wellbutrin, ibuprofen 800 mgs, Tylenol Extra Strength Arthritis pain medication 500 mgs, and Hydrochlorothiazide. Claimant was told to return in three months.

Claimant returned in December as instructed. (Tr. at 371-73). He had no new complaints, although he reported that he was not taking his medication for high blood pressure, because he felt it caused lightheadedness and palpitations. Claimant also stopped taking Wellbutrin because he did not feel it was helping. Regardless, Claimant reported having no change in mood or motivation when off of the medication. (Tr. at 371). On physical examination, Claimant had an elevated blood pressure at 128/87. He weighed 407 pounds, but his heart and lungs were normal. (Tr. at 372). Dr. Holmes noted nonpitting edema of Claimant's ankles, bilaterally, which he attributed to inactivity. He prescribed Furosemide 20 mgs and told Claimant to return in one month. (Tr. at 373).

On January 7, 2013, Claimant presented to Dr. Holmes's office for follow-up. (Tr.

at 374-76). He had no new problems. On examination, Dr. Holmes found Claimant's blood pressure to be high at 129/94. He weighed 398 pounds. Otherwise, the examination was unremarkable. Claimant was diagnosed with benign hypertension and obesity. (Tr. at 376). He was instructed to return in two months.

Two months later, on March 7, 2013, Claimant returned to Dr. Holmes's office as instructed. (Tr. at 377-79). He complained of sinus pressure and itchy throat. Claimant's blood pressure remained high, but he had lost ten pounds. On examination, Claimant had signs of sinusitis and rhinitis. He was given prescriptions for cetirizine and amoxicillin. (Tr. at 379).

Claimant returned five days later to review bloodwork taken by Dr. Holmes on March 7. (Tr. at 380-82). While Claimant's laboratory results suggested diabetes mellitus, Claimant reported that he had consumed large quantities of sweet tea the day prior to the blood draw. Dr. Holmes discussed diabetes mellitus in detail with Claimant, advising him of the need to maintain a proper diet and watch for signs of diabetic complications. (Tr. at 380). On physical examination, Claimant was again noted to have high blood pressure. His weight was down to 385 pounds. He displayed symptoms of acute bronchitis and was given an inhaler, as well as diabetes supplies. (Tr. at 382). Dr. Holmes instructed Claimant to return in two weeks.

Claimant presented on March 26, 2013 in follow-up. (Tr. at 383-85). He reported having been hospitalized on March 23 for diabetic ketoacidosis, dehydration, and hypokalemia. He required resuscitation. Dr. Holmes noted that, going forward, Claimant would be followed by an endocrinologist for his diabetes. (Tr. at 383). Claimant told Dr. Holmes that he did not feel well. His blood pressure was normal, and his weight was 388 pounds. He appeared alert and nourished, but was poorly developed. Dr. Holmes decided

13

to refer Claimant to a podiatrist due to his uncontrolled diabetes, and to a chiropractor for complaints of low back pain. (Tr. at 385).

Claimant went to the Huntington Foot & Ankle Clinic on April 19, 2013 and saw Chris Wood, DPM. (Tr. at 394). Claimant complained of painful, thick calluses on his left foot that impeded ambulation. He advised Dr. Wood that he was diabetic. Dr. Wood examined Claimant's feet and observed that while skin coloration was normal, the skin was thin and shiny. Claimant's left foot, third toe had hyperkeratotic tissue plantarly. His dorsalis pedis pulse was nonpalpable, and skin temperature was decreased. Dr. Wood diagnosed Claimant with diabetic pre-ulcerative calluses and prescribed diabetic shoes and custom inserts. (*Id.*).

On April 30, 2013, Claimant returned to Dr. Holmes's office for follow-up. (Tr. at 386-88). He reported feeling "fine." (Tr. at 386). Claimant was monitoring his blood sugar and taking his medications without noticing any side effects. His blood pressure was elevated, but his blood sugars met the targeted range. (Tr. at 387). Claimant was adhering adequately to his recommended diet and weighed 379 pounds. Dr. Holmes tweaked Claimant's medications and told him to return in one month. (Tr. at 388).

Claimant has his second appointment with Dr. Wood on May 13, 2013. (Tr. at 393). On this visit, he received his special shoes and inserts and was given instructions on how to break-in the shoes. Dr. Wood noted that the shoes fit properly, and Claimant was satisfied with them. Claimant saw Dr. Wood again on June 3, 2013, with no changes noted. (Tr. at 392).

Claimant appeared at Dr. Holmes's office for his scheduled follow-up on May 31, 2013. (Tr. at 389-91). He continued to do well on his medications, although his blood pressure was still elevated at 126/80. (Tr. at 389-90). On examination, Claimant

14

appeared alert and in no acute distress, but also looked "not well hydrated." (Tr. at 391). Dr. Holmes diagnosed Claimant with uncontrolled diabetes mellitus and told him to return in two months.

### B. RFC Evaluations and Opinions

On March 27, 2012, Claimant underwent a psychological evaluation by Susan Bartram, M.A., at the request of the SSA. (Tr. at 309-14). Ms. Bartram began with a clinical interview, noting that Claimant was applying for disability benefits due to back pain, knee pain, depression, and anxiety. (Tr. at 309). She asked Claimant how his symptoms affected his daily life, and he responded that he could not stand, kneel, or sit for any length of time without pain. He added that not being able to work had caused him to become depressed. Claimant indicated that he lived with an uncle, who fully supported him. Claimant stated that his back and knee pain had started in 2008; however, he continued to work until 2011. On October 31, 2011, Claimant quit his job as a telemarketer because he was going to be fired for poor performance. (Tr. at 310). He had not attempted to return to work thereafter. With respect to his depression, Claimant reported that it started in 2008 and had gotten progressively worse. He described being tired, sleeping too much, and feeling worthless. He felt anxious around people and worried about his future. Claimant had never received counseling for his psychological symptoms, but took Wellbutrin for depression.

Claimant provided an educational, vocational and social history. (Tr. at 311). He stated that he was born and raised in Cabell County, West Virginia by both of his parents. He reported having a "fun, normal" childhood, although his family moved frequently. Claimant never married. He indicated that he completed the 10th grade in school, and was the victim of bullying. He obtained a GED after leaving school. Claimant worked as a

laborer for a while, doing construction, plumbing, restaurant work, and delivering parts for an auto dealer. Claimant's last job was as a telemarketer. Claimant described his activities of daily living to include personal grooming and hygiene, limited cooking, reading, watching television, and visiting with his uncle. (*Id.*). On days when he felt depressed, Claimant stayed in bed and withdrew from others.

Ms. Bartram conducted a mental status examination of Claimant. (Tr. at 312). He was noted to be casually dressed with fair grooming and hygiene. He sat slightly slumped forward and walked with a slow gait. He also limped and had a cane with him. Claimant was generally cooperative during the examination. His social interaction was normal; his eye contact was good; his verbal responses were adequate and appropriate. Claimant was oriented in all four spheres and his speech was relevant and coherent. Claimant's mood was found to be depressed and irritated, and his affect was blunted. However, Claimant's thought process and content were normal; his immediate, recent, and remote memory were normal; his concentration, persistence, and pace were normal; and his judgment and insight were intact.

Ms. Bartram assessed Claimant with major depressive disorder, recurrent, severe without psychosis. (Tr. at 312). She based her assessment on Claimant's reported symptoms of staying in bed for days at a time and feeling worthless and guilty. She felt his prognosis was poor to fair, depending on whether he obtained consistent and appropriate psychotropic and psychological interventions. (Tr. at 313). She believed Claimant could manage his own benefits.

On May 15, 2012, Claimant was examined by Stephen Nutter, M.D., of Tri-State Occupational Medicine, at the request of the SSA. (Tr. at 327-34). Claimant advised Dr. Nutter that he was applying for disability benefits due to his back and knees. (Tr. at 327).

He stated that his back problems began in 2007. His pain was constant and radiated down his right leg, causing numbness. According to Claimant, activities like bending, stooping, sitting, lifting, standing, and riding in a car aggravated his discomfort. He claimed that his legs would go numb if he sat for too long. Claimant also complained of joint pain in his hands, shoulders, hips, and knees, which was constant in his knees. He described his knees popping, and this event triggered pain. Claimant stated that walking, standing, kneeling, squatting, and going up and down stairs increased his knee pain. (Tr. at 327-28). Reaching up, pushing, or pulling increased his shoulder pain. (Tr. at 328).

Claimant provided relevant history, stating that he had never had joint replacement or aspiration. He had no chronic medical illnesses and had never had surgery. Claimant identified his treating physician as Dr. Holmes. He stated that he last worked in 2007 as a telemarketer. Claimant reported having problems with shortness of breath and wheezing. He indicated that he could only walk 200 t0 300 feet on flat ground before he became short of breath and had to stop and rest.

Dr. Nutter performed a physical examination of Claimant. (*Id.*). Claimant stood 6 feet 1 inch tall and weighed 425 pounds. His blood pressure was high at 152/90. Claimant was observed walking with a normal gait, and he did not use a handheld device. He was comfortable in both supine and sitting positions. His memory appeared normal, and his intellectual function appeared average. Claimant's head, ears, eyes, nose, throat, and neck were unremarkable. (Tr. at 329). Claimant's chest had an increased AP diameter due to obesity. There were no signs of shortness of breath or abnormal breath sounds; however, Claimant showed mild restrictive pulmonary disease on a ventilatory function study. (Tr. at 329, 333). His cardiovascular examination appeared normal, except for some edema. (Tr. at 329). His abdomen was morbidly obese, but otherwise unremarkable. Dr. Nutter

17

examined Claimant's upper extremities and found that they were nontender, with no evidence of redness, warmth, swelling, or nodules. His range of motion of the shoulder was normal. Claimant's grip strength was 5/5 bilaterally. He was able to write and pick up coins without difficulty. Dr. Nutter's examination of Claimant's legs and cervical spine yielded no worrisome findings, but Claimant complained of pain on range of motion of his dorsolumbar spine. (Tr. at 330). Neurologically, Claimant showed normal muscle strength bilaterally, except for his left hip, which had limited flexion and extension due to pain. His reflexes and sensation were intact. Claimant was able to walk on heels and toes and do a tandem gait, but squatting caused knee pain.

Dr. Nutter diagnosed Claimant with chronic lumbar strain and degenerative arthritis. He did not find definite evidence of nerve root compression. Dr. Nutter commented that Claimant had pain and crepitus in his knees, primarily due to his obesity. There was no evidence of rheumatoid arthritis. (Tr. at 331).

On August 8, 2012, Dr. Uma Reddy completed a Physical Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 136-38). Dr. Reddy found that Claimant could occasionally lift and carry 10 pounds, frequently lift and carry 10 pounds, and stand, walk, or sit about six hours each in an eight-hour work day. She felt Claimant had an unlimited ability to push and pull. (Tr. at 137). He could occasionally climb ramps and stairs, balance, stoop, and crouch, but he could never climb ladders, ramps, and scaffolds, kneel, and crawl. She explained that Claimant's knee pain precluded him from squatting, and his morbid obesity prevented him from climbing ladders, ropes and scaffolds. Dr. Reddy found no manipulative or communicative limitations, but believed that Claimant should avoid concentrated exposure to extreme temperatures, wetness, humidity, vibrations, fumes, odors, gases, poor ventilation, and dusts. (Tr. at 137-38). She

recommended that he avoid even moderate exposure to hazards. She explained these environmental limitations by stating that Claimant might not be able to move quickly away from dangerous work situations, and his obesity might make concentrated exposures to the other environmental conditions uncomfortable. (Tr. at 138).

On July 11, 2013, Dr. Holmes responded to certain focused questions sent by Claimant's disability counsel. (Tr. at 395-96). Dr. Holmes indicated that Claimant had morbid obesity, chronic back pain, and social anxiety based upon objective findings. He did not feel Claimant was capable of engaging in employment 8 hours per day, 5 days per week on a consistent basis due to Claimant's medical problems. Dr. Holmes did not list any additional impairments that limited Claimant's ability to work. (Tr. at 396).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   <u>Analysis</u>

As previously stated, Claimant's sole challenge involves the weight given to the opinion of Dr. Holmes that Claimant was not capable of consistently working a five-day, eight-hour per day week. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given

***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6),[3] and must explain the reasons for the weight given to the opinions.[4] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. 1996). Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987).

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[4] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole.

*Id.* at *3.

Here, the ALJ specifically considered the opinion offered by Dr. Holmes. (Tr. at 18). The ALJ acknowledged that Dr. Holmes was Claimant's treating physician, and that Dr. Holmes believed that Claimant was unable to work due to morbid obesity, chronic back pain, and social anxiety. Nonetheless, the ALJ rejected Dr. Holmes's opinion for two reasons. First, the ALJ pointed out that the opinion was on an issue reserved to the Commissioner. Pursuant to SSR 96-5p, this type of statement is an administrative finding, not a medical opinion, and, therefore, is not entitled to any special weight. Second, the ALJ did not feel that Dr. Holmes's opinion was supported by the medical records. The ALJ noted that Claimant had complained of intermittent health problems for years, but had been able to work even when his symptoms were at their worst. (*Id.*). She emphasized that in the five years that Claimant had treated with Dr. Holmes, Claimant had lost weight and his blood pressure had decreased to the point where he stopped taking antihypertensive medication. Although Claimant still complained about his knees, the records from Dr. Holmes's office demonstrated that Claimant was treated only with nonsteroidal anti-inflammatory medications. Moreover, his condition was described as stable. Claimant complained of depression, but unilaterally stopped taking anti-depressant medication, confirming that he had no real mood change after stopping the medication. The ALJ further commented on the significant overall improvement in Claimant's condition leading up to the administrative hearing.

Accordingly, contrary to Claimant's contention, the ALJ fully considered Dr. Holmes's opinion, weighed it in light of the evidence, and explained why she found it lacking in support. It is important to note that before the ALJ weighed Dr. Holmes's opinion, the ALJ thoroughly reviewed and discussed Claimant's testimony and

23

statements, the treatment records, the findings made on consultative examinations, and the medical source statements. The ALJ's rationale for discounting the opinion was clear. She was not confused about the basis of Dr. Holmes's statement, she simply disagreed with it, finding the opinion to be inconsistent with other substantial evidence in the record, not the least of which was Dr. Holmes's own office record. In addition, as the ALJ stated, the opinion offered by Dr. Holmes was not entitled to special weight or significance, because under the pertinent regulations and ruling, opinions on whether or not a claimant is capable of working invade the province of the Commissioner. Although the ALJ was bound to consider Dr. Holmes's statement, she was not obligated to give it controlling weight or even special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Morgan v. Barnhart,* 142 F. App'x 716, 722 (4th Cir. 2005).

Having carefully reviewed the record, the Court finds that the ALJ's decision is supported by substantial evidence. While the medical evidence established that Claimant was morbidly obese and had discomfort in various joints and in his low back, nothing in the record (other than Dr. Holmes's unfounded statement) suggested that these impairments prevented Claimant from performing less than a full range of light exertional work. The ALJ adopted Dr. Reddy's opinions and included a series of limitations in the RFC finding designed to address the functional deficits related to Claimant's weight, medical conditions, low back pain, and inability to squat. The limitations selected by the ALJ were adequate given the objective findings. At Claimant's evaluation by Dr. Nutter, Claimant was able to walk with a normal gait, heel and toe walk, and tandem walk. (Tr. at 328-30). He was comfortable in both the supine and sitting positions, and his straight leg-raising test was negative. Claimant's grip strength was equal and normal at 5/5. He could write and pick up coins without difficulty. Claimant's muscle strength in the

extremities was normal except for some reduction of flexion and extension of the left hip, but there were no signs of muscle atrophy. His reflexes were normal bilaterally and his sensation was intact. Dr. Nutter found some range of motion limitations in Claimant's knees that were related to his weight, which at that time was 425 pounds. However, Claimant steadily lost weight after his consultative examination, and within one year, Claimant was nearly fifty pounds lighter. (Tr. at 387). When Claimant consistently performed physical therapy exercises, his knee pain decreased substantially, his knee strength increased, and his overall tolerance for activity increased. His treatment was largely conservative. He did not require surgical intervention, wear braces, receive injections, or undergo joint aspirations. He occasionally used a cane, but never had an assistive device prescribed for him. By the time of the administrative hearing, Claimant had even stopped taking some of his medications because he did not feel that he needed them.

In addition to the medical evidence, Claimant's self-reported activities, as described in his Adult Function Reports and in reports to treating and examining medical sources, were consistent with the ALJ's RFC finding. Claimant described a normal day as watching television, preparing and eating his meals, logging on to Facebook, watching television, reading, and performing light housework and laundry. Claimant also liked to play online games and interacted with his parents and uncle frequently. (Tr. at 285-88). At the administrative hearing, Claimant testified that he walked a couple of blocks every day and watched his diet, resulting in substantial weight loss. Dr. Holmes documented that Claimant was meeting his target blood sugars. Thus, taking the record as a whole, the ALJ's determination that Claimant could do some light and sedentary jobs was factually sound and corroborated by the expert opinions.

25

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to counsel of record.

**ENTERED:**  December 16, 2015

Cheryl A. Eifert
United States Magistrate Judge